## In re Anonymous No. 20 D.B. 76

Disciplinary Board Docket no. 20 D.B. 76.

UNKOVIC, *Board Member,* February 4, 1977—

### STATEMENT OF THE CASE

This case arises under a petition for discipline filed against respondent on June 1, 1976. The proceedings were initiated by reason of the entry by respondent of a plea of nolo contendere, on April 29, 1976, in the Court of Common Pleas of [ ] County,

to 20 counts of violation of section 3927 of the Crimes Code of December 6, 1972, P.L. 1482, 18 C.P.S.A. §3927, each of which charged respondent with receiving moneys upon agreement subject to a known legal obligation to make specified payments of Pennsylvania sales tax, and intentionally dealing with such money as his own and failing to make the required tax payments.

On May 21, 1976, the Supreme Court of Pennsylvania entered an order suspending respondent from the practice of law in the Supreme Court and in all courts under its supervisory jurisdiction, pursuant to Rule 17-14(a) of Disciplinary Enforcement.[1] The matter was then referred by the Supreme Court to the Disciplinary Board for the institution of a formal proceeding before a hearing committee pursuant to Rule 17-14(c), for the purpose of determining the extent of final discipline to be imposed.

The petition for discipline charges that respondent's alleged misconduct occurred when respondent, as "Secretary and Manager" of [A] Chevrolet, Inc., obtained money from 20 customers of the automobile agency which was to have been used to make payment of sales tax on an automobile purchased by the customer, and failed to make such payment.

The petition alleges that respondent, having been

---

1. On June 28, 1976, the Supreme Court redesignated Rule 17 of the Supreme Court as the Pennsylvania Rules of Disciplinary Enforcement, and renumbered the rules. Since this proceeding was instituted prior to the effective date of the redesignated rules, and since there was no substantive change in the rules here applicable, references herein are to the rules in effect when the proceeding was filed.

convicted of section 3927 of the Crimes Code by reason of a plea of nolo contendere, is in violation of the following Disciplinary Rules:

D.R. 1-102(A)(1), which prohibits the violation of a Disciplinary Rule;

D.R. 1-102(A)(3), which prohibits illegal conduct involving moral turpitude;

D.R. 1-102(A)(4), which prohibits conduct involving dishonesty, fraud, deceit or misrepresentation;

D.R. 1-102(A)(5), which prohibits conduct prejudicial to the administration of justice; and

D.R. 1-102(A)(6), which prohibits conduct that adversely reflects on an attorney's fitness to practice law.

On June 21, 1976, respondent filed an answer to the petition for discipline, in which he admitted that he had pleaded nolo contendere to the 20 indictments, but denied that he received funds subject to a known legal obligation to make payment of Pennsylvania sales tax. The answer also alleged that respondent was unaware that the Pennsylvania sales tax was being received by the automobile dealership or that it was not being paid over to the Commonwealth. Respondent further contended in his answer that Disciplinary Rules 1-102(A)(5) and 1-102(A)(6) are unconstitutionally vague and void for vagueness on their face, and when applied to the facts and circumstances of this case.

On July 1, 1976, the case was assigned to hearing committee [ ] for determination. On August 4, 1976, a prehearing conference was held before the full committee, and with counsel for petitioner and respondent present, to determine a preliminary

question of evidence, namely whether evidence regarding respondent's personal involvement in the crimes to which the plea of nolo contendere was accepted was admissible. The committee determined that evidence of personal involvement of respondent would be admitted, and issued a pretrial order to that effect under date of September 14, 1976.

A formal hearing before the committee was held in the offices of the Disciplinary Board in [ ], Pennsylvania, on Monday, September 27, 1976, and Tuesday, September 28, 1976. Petitioner produced, as exhibit P-1, copies of respondent's plea of nolo contendere and the indictments to which the plea was entered. As exhibit P-2, petitioner produced a transcript of the proceedings in a preliminary hearing held before District Judge [B], of [C], Pennsylvania, on October 23, 1976, in the cases of Commonwealth v. [A] and Commonwealth v. Respondent; as exhibit P-3, petitioner produced a transcript of proceedings held in court room 4 in the [ ] County courthouse, on Friday, March 19, 1976, in the case of Commonwealth v. Respondent, at which respondent's plea of nolo contendere was accepted; and as exhibit P-4, petitioner produced a copy of a transcript of the sentencing proceedings held in court room no. 5 in [ ] County courthouse on April 29, 1976, in the case of Commonwealth v. Respondent. As exhibit P-5, petitioner offered a copy of the order of the Pennsylvania Supreme Court dated May 21, 1976, which referred the matter to the Disciplinary Board of the Supreme Court.

Respondent's case consisted of testimony from respondent, together with testimony from nine other witnesses, primarily on the issue of respondent's character and reputation. In rebuttal, peti-

tioner introduced testimony from four witnesses, all of whom were former employes of the automobile agency with which respondent was associated.

Following the conclusion of the hearing, the notes of testimony were made available on October 22, 1976. Petitioner submitted a brief to the committee on November 10, 1976, and respondent submitted a brief to the committee on December 1, 1976.

## RULINGS ON ADMISSION OF EVIDENCE AND OTHER PROCEDURAL MATTERS

As noted above, the committee entered a prehearing order allowing respondent to offer evidence pertaining to his personal involvement in the crimes to which he pleaded nolo contendere. In making this determination, the committee considered the decision of the Disciplinary Board in the matter of [anonymous], Disciplinary Board Docket no. 9 D.B. 73, in which the board held that a hearing committee was foreclosed by Rule 17-14(c) from receiving testimony of extenuating or mitigating circumstances pertaining to the commission of a crime and subsequent conviction, and that evidence directly bearing on said guilt or innocence is inadmissible. The committee determined that, since liability under section 3927 of the Crimes Code may be imposed upon a corporate officer by reason of section 307(e)(2) of the Crimes Code for a "reckless omission" to perform a required act, it was proper to receive evidence of respondent's personal involvement in determining the discipline to be imposed by reason of the finding of guilt. The committee felt that this evidence did not bear on the guilt or innocence of respondent, but, on the contrary, provided

necessary background information without which the committee could not determine which disciplinary rules, if any, had been violated.

The committee further ruled, over the objection of counsel for respondent, that exhibits P-2, P-3, and P-4, which consisted of transcripts of testimony at hearings in [   ] County, were admissible as part of the record of these disciplinary proceedings against respondent.

Under the date of September 21, 1976, the Supreme Court of Pennsylvania, at the request of counsel for respondent, issued a subpoena to Honorable [D], a judge of the [   ] Court of Common Pleas. Under date of September 30, 1976, counsel for petitioner filed a petition with the Supreme Court of Pennsylvania to quash the subpoena issued to Judge [D], which petition to quash was granted by the Supreme Court on October 1, 1976. As a result, the committee did not receive testimony from Judge [D].

## FINDINGS OF FACT

1. Respondent was admitted to practice law in the Commonwealth of Pennsylvania in April, 1965 (N.T. 36). Respondent, who is now 36 years old, graduated from Villanova Law School in [   ]. He is married and has [   ] children (N.T. 13-14).

2. On October 30, 1972, [A] Chevrolet, Inc. commenced doing business in [C], Pennsylvania. Respondent was one of the founders and incorporators of the corporation, and was one of the two original officers of the corporation, serving as secretary-treasurer (N.T. 37).

3. Respondent was one of two owners of stock in [A] Chevrolet, Inc., owning 60 percent of the out-

standing shares; [A] owned the remaining 40 percent of the outstanding shares (N.T. 17, 36).

4. Respondent performed the legal services for the incorporation of [A] Chevrolet, Inc., and was the attorney for the corporation (N.T. 51).

5. Respondent invested in excess of $100,000 in [A] Chevrolet, Inc. (N.T. 80).

6. [A] was the experienced automobile man in the agency (N.T. 16-17, 38), and the two were granted a Chevrolet franchise from General Motors based on [A's] expertise in the automobile business (N.T. 46).

7. Respondent viewed his involvement in the automobile agency as a business investment and continued in the full-time practice of law as an employe of [   ] Insurance Company (N.T. 16-17).

8. During the spring and summer of 1973 [A] became ill, and his wife also became ill. As a result of these illnesses, [A] desired to retire from participation in the agency (N.T. 18).

9. Although he desired to terminate his relationship with the business [A] remained as the day-to-day manager until August 8, 1974, when he resigned as an officer and director of [A] Chevrolet, Inc. (N.T. 38). It is uncontroverted that [A] managed the business on a day-to-day basis prior to August, 1974 (N.T. 89; 101-102).

10. At the time of [A's] resignation, the automobile dealership was having serious financial problems (N.T. 20), and respondent was attempting to find a qualified automobile person to assume the supervisory role which had been performed by [A] (N.T. 20-21). From August, 1974, until August, 1975, when the dealership ceased doing business, respondent and respondent's father were the only members of the Board of Directors of [A] Chevrolet, Inc. (N.T. 38).

11. From August, 1974, until August, 1975 [A] worked at the agency as a part-time employe during the hours of 9:00 a.m. to 12:00 noon, although [A] performed virtually no services for the dealership during that time (N.T. 45, 92).

12. From August, 1974, until August, 1975, respondent continued in the full-time practice of law (N.T. 19), and attempted to keep in touch with the dealership by telephone or by occasional visits (N.T. 19, 63).

13. From August, 1974, until August, 1975, the various employes of the dealership who were on the premises ran its affairs on a day-to-day basis and consulted respondent when they believed they had problems they could not solve (N.T. 63).

14. From August, 1974, until August, 1975, [E], the sales manager of the dealership during that period, spoke to respondent in person only occasionally, although there was frequent telephone contact (N.T. 100).

15. From August, 1974, until August, 1975, [F], the title clerk and bookkeeper of the dealership during that period, stated that her contact with respondent occurred three or four times a week, either by occasional visit or by telephone (N.T. 158). It is clear that respondent was infrequently present at the dealership during the period from August, 1974, until August, 1975.

16. Sometime in the summer of 1974, the dealership first encountered problems with payment of Pennsylvania sales tax. Respondent became aware of the failure to pay Pennsylvania sales taxes in August, 1974, while reviewing the financial situation of the dealership with a potential buyer.

17. The sales tax delinquencies resulted from the fact that the dealership collected Pennsylvania sales tax from purchasers of automobiles, but did

not remit such taxes to the Commonwealth in a timely fashion. [F], the bookkeeper and title clerk, became aware of these problems shortly after she was hired in June, 1974 (N.T. 156-157). [F] brought these sales tax delinquencies to [A's] attention prior to August, 1974 (N.T. 157).

18. In order to deal with the sales tax delinquency which existed in late 1974, respondent made arrangements for the payment of such taxes from funds which were payable to the dealership, in November, 1974, and January, 1975, from General Motors Corporation as rebates, thus bringing sales taxes current as of January, 1975 (N.T. 20-22, 80-81).

19. Because of the shortage of working capital of the dealership, payments of sales tax to the Commonwealth again became delinquent in early 1975, and in March, 1975, [F] brought the sales tax problems to respondent's attention (N.T. 23). At respondent's request, [F] prepared an adding machine tape showing the amount of the delinquent sales taxes, and advised him that there was $11,480 of delinquent taxes owing at that time (N.T. 24-25). Respondent then caused funds in that amount to be transferred from his own personal savings to the account of the dealership, and used all of the funds so deposited to pay the delinquent sales tax in order to bring the sales taxes current as of late March, 1975 (N.T. 25-27; 161-62; 171).

20. Because of the history of difficulty with sales tax payments, respondent, in late March or early April, 1975, directed the personnel of the dealership to obtain separate checks from customers for sales taxes and to send those checks directly to the Commonwealth of Pennsylvania—not to the corporate treasury—in payment of sales tax obligations (N.T.

23, 28). Testimony by respondent regarding these instructions was corroborated by the bookkeeper for the dealership, the sales manager for the dealership, and one of the salesmen (N.T. 162-63; 105; 153-54).

21. At some time in early 1975, respondent instructed [F] to pay sales tax due to the Commonwealth "if there was any money left over" after paying other expenses such as light, heat, salaries, and other fixed costs. The evidence was conflicting with respect to when such instructions were given by respondent. The committee finds that discussions between respondent and [F] regarding the payment of sales tax, which discussions may have covered the priorities for the payment of bills, occurred both prior to and subsequent to the date in late March or early April, 1975, when respondent instructed sales personnel to obtain separate checks for the Pennsylvania sales tax.

22. From late March or early April, 1975, until May, 1975, respondent was not aware that sales personnel were failing, in many cases, to obtain a separate check from customers for payment of Pennsylvania sales taxes (N.T. 29; 162-63).

23. Commencing in May, 1975, General Motors Acceptance Corporation ("GMAC"), a principal creditor of [A] Chevrolet, Inc., began to exercise control over payments received from customers for the sales of cars, by applying all moneys received from customers (including that applicable to sales tax) to reduce indebtedness to GMAC (N.T. 29-32; 66). In May, 1975, the dealership did not have sufficient funds to make sales tax payments with respect to automobiles sold during March, April and early May for which sales tax had not been collected by separate check, and, because of the control

exerted by GMAC over money received by the dealership, the dealership did not have sufficient funds to make proper remittances to the Commonwealth of Pennsylvania with respect to sales taxes subsequent to May, 1975.

24. Beginning in or about October, 1973, until the dealership ceased doing business, respondent was looking for an investor to purchase [A's] stock in the corporation (N.T. 40, 41). Respondent hoped to keep the dealership open so that he could find a buyer acceptable to General Motors and the Chevrolet Division (N.T. 64-65).

25. Respondent would have benefited had a buyer been found to purchase [A's] stock in the corporation, and had the dealership been able to maintain operations (N.T. 65). In addition, the delinquent Pennsylvania sales taxes which accumulated after March, 1975, might have been cleared up had a satisfactory buyer of the dealership been located (N.T. 65).

26. After the dealership closed its doors in August, 1975, respondent offered restitution of sales tax payments to the customers of the dealership, but most customers accepted restitution instead from General Motors (N.T. 34, 35).

27. Respondent's plea of nolo contendere was entered by him in recognition of the fact that he had been in reckless disregard of his responsibility to oversee that the employes of the dealership made payments of the Pennsylvania sales taxes in a timely fashion (N.T. 34, 85). See also Exhibit P-3, Notes of Testimony in Commonwealth v. Respondent, in the Court of Common Pleas of [ ] County, no. 1748C, 1975, hearing held Friday, March 19, 1976, at pages 5-6, 11-14.

## DISCUSSION

The principal issue bearing on the discipline to be imposed in this case is whether respondent, by personally directing and controlling the operations of [A] Chevrolet, Inc. during the period from late March or early April, 1975, through August, 1975, arranged for employes of the dealership to avoid the payment of Pennsylvania sales taxes owing on automobiles purchased by customers of the dealership in order to enable respondent to salvage his substantial investment in the dealership, or whether the nonpayment of such Pennsylvania sales taxes resulted from respondent's "reckless omission" to perform a corporate duty during that period. Petitioner argues forcefully that the nonpayment of Pennsylvania sales taxes was pursuant to a "scheme" for nonpayment of sales taxes arranged by respondent from which he would personally benefit. Respondent denies that the evidence produced at the hearing supports the finding of a "scheme" and in fact indicates that respondent was unaware of the failure to pay delinquent sales taxes after April, 1975, until he was informed of the delinquency in May, 1975, at which time control over funds coming into the dealership was out of his hands.

Respondent could have been found legally responsible for the dealership's failure to make timely payment of sales tax under either subparagraph (1) or subparagraph (2) of section 307(e) of the Crimes Code, 18 C.P.S.A. §307(e), which reads as follows:

"(1) A person is legally accountable for any conduct he performs or causes to be performed in the name of a corporation or an unincorporated associ-

ation or in its behalf to the same extent as if it were performed in his own name or behalf.

"(2) Whenever a duty to act is imposed by law upon a corporation or an unincorporated association, any agent of the corporation or association having primary responsibility for the discharge of the duty is legally accountable for a reckless omission to perform the required act to the same extent as if the duty were imposed by law directly upon himself."

During the hearing at which respondent entered his plea of nolo contendere, Honorable [G], Judge of the Court of Common Pleas of [ ] County, Pennsylvania, stated as follows to respondent (P-3, pages 13-14):

"Suffice to note to you, [respondent], that whether the charge here is that the corporation owed a duty to account under 3927 and failed to do so, that liability is imposed upon you as an individual under 307, subsection (e) (2), or whether the offense involved requires accountability by you as an individual under sub-section (e) (1): 'A person is legally accountable for any conduct he performs or causes to be performed in the name of a corporation, regardless of which of those two sub-sections we have to deal with, personal accountability has been attached to you under the theory of the Commonwealth by reason of Section 307, the accountability section of the Crimes [Code]'."

Since respondent could have been found guilty either if there were a "reckless omission" on his part to see to it that the act required of the corporation was performed, or if respondent actually caused the improper act to be performed, it became necessary for the committee to determine which of

the two subsections of section 307(e) was more likely to cover respondent's actions.

In its argument that respondent developed a scheme to cause the corporation to withhold the required payment of sales taxes, petitioner relies heavily upon the testimony of [H], the controller of the dealership, and [F], the bookkeeper. Petitioner argues that respondent instructed [F] in or about March, 1975, to pay sales taxes only after paying other dealership expenses, and that these instructions demonstrate respondent's personal involvement in the crimes. However, as indicated in finding of fact no. 21, the testimony of [F] was conflicting with respect to when respondent gave such instructions regarding the payment of sales taxes. In any event, the committee does not believe that the date or dates on which the respondent gave instructions regarding the payment of bills is crucial to this case. If the instructions were given *prior* to late March, 1975, then the sales tax delinquencies which resulted were cured by respondent when he added new capital to the dealership on or about April 1, 1975; and if instructions regarding the priority of paying bills were given by respondent *after* late March, 1975, then they were given at a time when respondent believed that the sales personnel were obtaining separate checks from customers for sales tax payments, so that any funds which entered the dealership bank account would not be subject to the payment of sales taxes.

[H] testified that he did not submit certain financial statements to GMAC because respondent requested that he not do so (N.T. 107-108). Petitioner argues that the failure to submit the financial statements to GMAC was motivated by respondent's desire to conceal the sales tax delinquencies.

Respondent testified that he did not instruct [H] to withhold data from GMAC, and, furthermore, that the reports which were submitted did disclose the sales tax problems.

The committee was not persuaded by [H's] testimony that the withholding of reports from GMAC was part of a design by respondent to avoid the corporation's responsibility for sales tax payments. [H] did not appear to the committee to be a convincing witness, in view of the fact that he had been fired by [A] Chevrolet, Inc. in June of 1975, for disclosing confidential information to persons who were negotiating for the purchase of [A's] stock in the dealership.

It is uncontroverted that respondent was engaged in the full-time practice of law from April, 1975, through August, 1975, when the delinquencies which resulted in his criminal conviction occurred. Although respondent was the principal owner of the dealership during this time, he visited only occasionally and attempted to maintain contact with it by telephone calls. Respondent appeared to the committee to have gotten himself into a business arrangement which required more time than he was able to give, and he therefore did what he could and hoped the financial problems would somehow disappear. Instead the problems became more severe, and respondent failed to take the necessary affirmative actions which might have prevented the criminal charges from having been made against him. As the principal shareholder and officer of the corporation, respondent should have made certain that his directions to dealership personnel that separate checks be obtained from customers covering Pennsylvania sales tax were being followed, and that the proper sales tax pay-

ments were being made, particularly in view of the history of sales tax delinquencies at the dealership going back to the summer of 1974. His failure to do so was a "reckless omission" on his part to see to it that the corporation carried out its legal responsibilities.

The committee therefore believes that respondent's plea of nolo contendere to 20 counts of violation of section 3927 of the Crimes Code was made because respondent could have been convicted of the crimes as the director or officer primarily responsible for the discharge of a duty imposed upon the corporation, and therefore was legally accountable for the failure of the corporation to perform a required act (the payment of sales taxes), which was not performed because of a "reckless omission" on his part. It should also be observed that respondent apparently did not realize, when he entered his plea of nolo contendere, that his conviction would be referred to the Supreme Court of Pennsylvania for its review, and that the plea of nolo contendere could lead to his suspension from practice before the court.

It now becomes necessary to determine what sanction should be imposed upon respondent by reason of his conviction, on a plea of nolo contendere, of the crimes with which he was charged.

It is significant that the first canon of the code of professional responsibility provides that "A lawyer should assist in maintaining the integrity and competence of the legal profession." Furthermore, Ethical Consideration 1-5, which is aspirational and not mandatory, provides as follows:

"EC 1-5    A lawyer should maintain high standards of professional conduct and should encourage

fellow lawyers to do likewise. He should be temperate and dignified, and he should refrain from all illegal and morally reprehensible conduct. Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession. Obedience to law exemplifies respect for law. To lawyers especially, respect for the law should be more than a platitude."

The disciplinary rules designed to implement these standards include Disciplinary Rules 1-102(A)(3), (4), (5), and (6), all of which respondent is charged with violating.

In order to find that respondent was in violation of DR 1-102(A)(3), which prohibits "illegal conduct involving moral turpitude," the committee believes it would have been necessary for it to determine that respondent's conduct caused the diversion of sales tax moneys to his own account. Since the committee has determined that respondent's conduct involved a "reckless omission" to act, the committee finds that respondent's conduct did not involve moral turpitude.

The term "moral turpitude" has been defined by the courts of Pennsylvania as an act of personal misconduct which may be characterized as an act of "baseness, vileness, or depravity." John's Vending Corp. v. Cigarette Tax Board, 3 Pa. Commonwealth Ct. 658, 662, 284 A. 2d 834 (1971), reversed on other grounds, 453 Pa. 488 (1973); Moretti v. State Board of Pharmacy, 2 Pa. Commonwealth Ct. 121, 125, 277 A. 2d 516 (1971).

The committee therefore finds that, although the conduct in which respondent was involved was illegal, it did not involve moral turpitude.

Disciplinary Rule 1-102(A)(4), which prohibits

conduct involving "dishonesty, fraud, deceit or misrepresentation," would likewise have required a finding by this committee that respondent's conduct was other than reckless. Because the committee is of the view that respondent's conviction on a plea of nolo contendere resulted from negligent and reckless action on his part in failing to oversee properly the operation of the dealership, the committee finds that Disciplinary Rule 1-102(A)(4) was not violated by respondent.

Disciplinary Rule 1-102(A)(5) prohibits conduct that is "prejudicial to the administration of justice." The committee has concluded that this Disciplinary Rule is not applicable to the facts of this particular case.

Disciplinary Rule 1-102(A)(6) prohibits conduct "that adversely reflects on his [respondent's] fitness to practice law." Although the committee had some concern as to the applicability of this rule to respondent, it nevertheless believes that, by reason of the commission of the crimes with which he was charged, respondent did violate the provisions of D.R. 1-102(A)(6), and that said rule is not void for vagueness in the circumstances of this case.

It seems clear that an attorney-at-law in Pennsylvania has ample notice that conduct by the attorney which results in his conviction of a crime for which he could be imprisoned for one year or more (other than motor vehicle code violations) will subject him to the possibility of sanctions. Rule 17-14 of the Rules of Disciplinary Enforcement, which rules have been widely publicized among attorneys, requires the Supreme Court to refer cases involving such criminal convictions of attorneys to the Disciplinary Board, and respondent thus should have been aware, long before the events which gave rise to this proceeding occurred, that

his conviction of a crime would subject him to inquiry.

Furthermore, the Pennsylvania Supreme Court has observed as follows in considering a "void for vagueness" argument regarding D.R. 1-102(A)(6):

"It is clear that case law can sufficiently clarify an otherwise vague enactment. . . . Numerous Pennsylvania disciplinary cases have resulted in the imposition of sanctions when an attorney has engaged in criminal conduct. . . . These cases placed respondent on notice that the participation in criminal activity subjected him to the possibility of disbarment as unfit to practice law. They eliminate, to a degree, the vagueness ascribed to D.R. 1-102(A)(6)." Office of Disciplinary Counsel v. Campbell, 463 Pa. 472, 345 A. 2d 616, p. 622 (1975), at p. 483 of 463 Pa., fn. 7.

It is also clear that the commission of a crime by an attorney, whether he is acting individually or as a lawyer, may subject him to sanctions, and that a certificate of conviction of the crime is conclusive evidence in this proceeding that the crime was committed. Rule 17-14(b) of the Rules of Disciplinary Enforcement.

The committee on Ethics and Professional Responsibility of the American Bar Association, in formal opinion 336, issued June 30, 1974, stated as follows:

"In regulating a lawyer's nonprofessional as well as professional conduct, the Code of Professional Responsibility charted no new course. It is recognized generally that lawyers are subject to discipline for improper conduct in connection with business activities, individual or personal activities, and activities as a judicial, governmental or public official."

In addition, the fact that Rule 17-14(c) of the Rules of Disciplinary Enforcement provides that the extent of the final discipline to be imposed is the "sole issue" to be determined by a hearing committee in a situation in which an attorney is convicted of a crime, carries with it the implication that the commission of the crime is itself a violation of the Disciplinary Rules.

For the foregoing reasons, the committee finds that respondent has violated Disciplinary Rule 1-102(A)(6), and has further considered the discipline to be imposed upon respondent, particularly in light of the suggestion by petitioner that respondent should be suspended from the practice of law for such additional period of time as the committee may determine.

In a case somewhat comparable to the present one, Office of Disciplinary Counsel v. [anonymous], Disciplinary Board Docket no. 3 D.B. 74, an attorney was convicted, upon a plea of guilty, for willful and knowing failure to file his income tax return for the year 1970, and was fined $10,000. The hearing committee in that case, having concluded that respondent violated Disciplinary Rules 1-102(A)(5) and (6), recommended that respondent be suspended from the practice of law for a period not to exceed one year, which period would include the time necessary to obtain reinstatement. On appeal to the Disciplinary Board, the recommendation of the hearing committee was reduced, and the board recommended to the Supreme Court that respondent be suspended from the practice of law for a period of six months. The Supreme Court, after consideration of both the report of the hearing committee and the Disciplinary Board, entered an order directing that respondent be publicly censured, rather than suspended from the practice of

law. In the (3 D.B. 74) case, the attorney was not initially suspended pending the recommendation of the Disciplinary Board, and therefore was continuously able to maintain the practice of law, although the crime of which the attorney was convicted was more closely related to his law practice than the crimes in this case.

In the present case, respondent has been suspended from the practice of law since May 17, 1976, a period now of over eight months. Furthermore, the character and reputation witnesses who testified on respondent's behalf attested to his honesty and integrity as a member of the bar for in excess of ten years. The Rabbi of the [I] Center testified that he had known respondent for more than 25 years, and found him to be of the highest integrity. It was also established that respondent has a clear disciplinary record, and, during his testimony, respondent appeared to be genuinely contrite and recognized the errors he made while acting as principal shareholder and director of the dealership.

In view of the circumstances, the committee recommends that, in this case, the discipline of a private reprimand by the Disciplinary Board should be administered.

## CONCLUSIONS OF LAW

1. Respondent was guilty of a violation of Disciplinary Rule 1-102(A)(6), relating to engaging in conduct that adversely reflects on his fitness to practice law, and also thereby is in violation of Disciplinary Rule 1-102(A)(1), dealing with the violation of a disciplinary rule.

2. Respondent was not guilty of any other profes-

sional misconduct charged in the petition for discipline.

3. A private reprimand by the Disciplinary Board is recommended as the discipline in this case.

## RECOMMENDED DISPOSITION OF THE PETITION

The committee recommends that the board order that respondent be given a private reprimand by the Disciplinary Board.

## PRIVATE REPRIMAND

As you previously have been notified, the Disciplinary Board on May 13, 1977, determined that the petition for discipline filed against you, docketed at 20 D.B. 76, should be concluded by private reprimand. You were subsequently notified by certified mail, under date of June 29, 1977, to appear at this meeting of the board, for the purpose of receiving the private reprimand.

The record indicates that you have been found guilty of transgressing Disciplinary Rule 1-102(A)(6) (dealing with conduct that adversely reflects on fitness to practice law) and Disciplinary Rule 1-102(A)(1) (dealing with the violation of a disciplinary rule).

It is fortunate for you that the hearing committee recommended and the board approved only the imposition of a private reprimand and not a form of public discipline.

As Chairman of the Disciplinary Board, it is my duty to reprimand you for your misconduct. We urge that you conform to the code of professional responsibility in your future activities. Any sub-

sequent transgressions on your part can only result in further discipline and perhaps more drastic sanctions. We sincerely hope that you will comport yourself in such a manner that future disciplinary action will be unnecessary.